By the Court. Hoffman, J.
Thomas Carlisle applied to one E. M, Townsend for an advance, by way of loan, of $1500, offering to give him his bond, guaranteed by the defendant. He was then indebted to Townsend in an unpaid note of $197.
Mason consented to guarantee his bond for the repayment of such intended loan of $1500. Carlisle informed Townsend of such consent, and the latter agreed to make the loan.
A bond, dated the 28th. of March, 1848, was then executed by Carlisle to Townsend, in the usual form, on which Mason indorsed his guaranty, dated the same day, as follows:—
“ In consideration of the sum of one dollar to me in hand paid, *277 by B. M. Townsend, the obligee named in the within bond, the receipt whereof, etc., I, John M. Mason, do hereby guaranty and promise to the said R. M. Townsend, the payment to him, his heirs, executors, administrators and assigns, of the principal sum of $1500, mentioned in the condition of the said bond, or obligation, and the interest thereon, at the times and in the manner mentioned in the condition and agreement, written under said bond or obligation.”
“ In witness, etc.” (Signed) “ J. M. Mason.”
With this-bond Carlisle effected with Townsend a negotiation in the following manner:&emdash;The note of the former, with interest, (being the sum of $229.87,) then past due, was given up and treated as so much advanced. A bond and mortgage of one Little and wife, for the sum of $1200, with interest due of $93.55, was assigned by Townsend to Carlisle, for the residue of the loan. Thus the face of the debit to Carlisle, so made up, was $1523.49. Carlisle signed a statement to the effect that such account was correct, he being credited with the bond of March 28, 1848, for $1500, leaving him debtor $23.49. The old note of Carlisle was worthless.
But Carlisle, at the period of this transaction, had, with Townsend’s privity, negotiated with one Strong to cash the Little bond and mortgage. The sum of $1075 only was advanced upon it by Strong, and Townsend made the assignment of the bond and mortgage directly to Strong.
The questions to be considered may be thus presented:
Can a surety who has guaranteed the payment of $1500 to be advanced to his principal be held responsible for $1000, being the whole amount actually advanced?
Again, can a surety who has guaranteed an advance to a given amount, to be made in cash, be held liable when part of that amount was made in cash, and the residue,(about one-fifth of the whole amount,) was agreed, between the principal and creditor, to be applied in extinction of an old debt of the principal, who also was insolvent?
May the surety, in this last case, be held liable for the actual cash advance, if not for the whole sum?
But it is first to be observed, that the evidence to all the facts *278 which give rise to the defendant’s defence in this case is by parol. The instrument of guarantee is the written indorsement on the bond, making himself responsible for the payment of the $1500, according to its condition. But the consideration of the bond, like the contents of a receipt, is open to explanation by parol testimony. The principal obligor could show how he received the amount, or that he received less. The surety has the same right, and thus the facts are made out, by legal evidence, to raise the questions above indicated.
The questions are of interest, and I have examined a number of the leading authorities which appear to bear upon them.
In Phillips v. Astling, (2 Taunton, 206,) the contract was to guarantee a bill of exchange for a certain sum, viz., the price of goods supplied by the plaintiff. A bill was accepted for a larger sum, and the surety was held not liable for even the amount he had agreed to secure.
In Evans v. Whayle, (5 Bingham, 485,) the defendant guaranteed the plaintiff to the extent of £50, for any gold he might supply Evan Evans, for the purpose of working in his business, which was that of a goldsmith. The plaintiff discounted bills for Evans, and paid him, partly in money and partly in gold. The latter was used in the business. It was a purchase of bills, not a sale of gold in the way of trade. The surety was held not responsible.
Whitcher v. Hall, (5 Barn & Creswell, 269,) was a strong case of a comparatively immaterial difference between the contract guaranteed, and that substituted between the creditor and debtor. “The question is not as to the amount of the difference, but whether the contract performed by the plaintiff is the original contract to which the defendant was a party.”
See, also, Baron v. Chesney (1 Starkie, 192).
Islyn v. Hartell, (8 Taunton, 208,) is a' leading authority upon one point in this cause. The guarantee was: “I will be answerable for the extent of £5000, for the use of the house of Spitta, Moiling & Co.” The declaration had treated this as prospective, and the court inclined to think it was so. The plaintiffs, upon receiving the guarantee, cancelled a previous indebtedness by surrendering the vouchers and taking a new note. It was held that the surety was not liable.
*279 So in Bouter v. Cox, (4 Beavan’s Rep. 380,) John Cox, as a surety of Richard Cox, executed two notes “for value received by a draft at three months’ date.” The meaning was, that the parties to whom the notes were given, were to advance the money on a three months’ credit. The goods were sold payable on demand. These parties made the advances directly, so as to give them a right to demand immediate payment. The right of the creditor was thus materially different from that which was intended by the surety, and it was not a sufficient answer that no demand was made of the surety within the three months for which credit was given.
And in Bonar v. McDonald, (1 L. and Eq. Rep. 1, in the House of Lords,) Lord Brougham states the rule thus, as given in a note of Lord Oottenham, and expressed his concurrence in it: “Any variation in the agreement to which the surety has subscribed, which is made without the surety’s knowledge or consent, which may prejudice him, or which may amount to a substitution of a new agreement for a former agreement, and though the original agreement may, notwithstanding such variation, be substantially performed, will discharge the surety; and, as to Scotland, in Bell’s Principles, 71, the rule is laid down that the cautioner is Reed by any essential change consented to by the creditor in the principal obligation or transaction.”
The late case of Owen v. Homan, (3 McNaughten and Gordon, 378,) is one of much importance upon the general question, and some of the propositions are pertinent to the present question.
“The cases,” says Lord Truro, “which are reported, have generally arisen out of transactions in which there has been a personal communication between the creditor arid the surety; and the clear law deducible from these decisions is, that the creditor must make a full, fair, and honest communication of every circumstance calculated to influence the decision of the surety, in entering into the required obligation.”
He then adverts to the question, how the case would stand when the creditor leaves the debtor to communicate to the surety, and declines, or, at all events, abstains, from communication with the surety ? He refers to Pidcock v. Bishop, (3 Barn, and Cres. 605,) and a dictum of Ch. J. Tindal, in Hone v. Caupten, (5 Bing. *280 N. C. 142.) The motion before him (for a receiver) did not call for a decision of the question at that time.
In Pidcock v. Bishop the facts were these: The defendant signed the following guarantee: “ At the request of Mr. Thomas Tichell I beg to inform you that I will guarantee you in the payment of £200 value, to be delivered to him in pig iron.” This was dated 16th December, 1822. The plaintiffs supplied pig iron to the amount of £82 10s., and, upon default of payment, sued upon the guaranty. The defendant proved that Tichell agreed with the plaintiffs, that if they would let him have the iron at the market price, he would pay John Pidcock (manager of the plaintiff’s business at the iron works, and one of the associates) ten shillings for each ton, to be applied to an old debt from Tichell to him. On these terms, and a guarantee to be given, the bargain was made. Tichell then procured from the defendant the instrument sued upon, but did not communicate the arrangement as to the ten shillings.
Abbott, Oh. J., said:—“ The effect of the bargain would be, to compel the vendor to appropriate to the payment of the old debt a portion of those funds which the surety might reasonably suppose would go towards paying the debt for which he became responsible.”
And Littledale observed:—“The surety might fairly suppose that the vendee would be able to pay the market price of the iron out of its produce when manufactured, and he gave the guarantee under that supposition. If he had known the bargain, he would have known that the vendee would have so much less to appropriate in payment for the iron, and, consequently, that his risk would be thereby increased.” A nonsuit was entered.
There is a series of cases in the courts of our own country which impose a rule of equal strictness upon the creditor in his relations with the surety. And when there is a variance of a material nature, the question is not permitted to influence the decision whether the surety is, in fact, injured or not. (Miller v. Stewart, 9 Wheaton, 680; United States v. Tillotson, Paine’s C. C. Rep. 305; Nixon v. Palmer, 4 Selden, 398.)
It is, then, manifest that the question of benefit or prejudice directly arising to the surety is not now the test of his responsibility, ' If the terms he engaged upon are not fully observed, if *281 any deceit has been practised or connived at, which makes the contract between the debtor and creditor different from the one he prescribed or assented to; or if, without deceit, a material change is 'made, and the creditor has not communicated it, the surety will be discharged. Now, in the present case, the difficulty has occurred to us, that the contract of the surety, as well as the terms of the contract, as performed, are proven by parol. In most of .the cases, the conditions of the surety’s engagement are defined in the instrument. The written undertaking is simply to pay according to the condition of the bond if the obligor did not. The material element of the defendant’s contract was, that a loan of $1500 was actually tó be made—a clear new advance in cash. That is proven by parol.
But it may be questioned whether such evidence be at variance with the written document. If the consideration of the bond be fully open, it may well result that the consideration of the surety’s engagement is also open to similar testimony. But chiefly we consider, that here was what is equivalent to a deception and legal fraud upon the surety. Townsend knew that he intended to be bound for a cash advance, and Townsend changes that into the extinction of an old debt due to himself and a partial cash advance. The difference is, that Carlisle actually received but $1052 for the $1500 which the defendant expected, and guaranteed upon such expectation. Townsenff does not communicate this to the defendant. Our conclusion is, that the evidence is admissible, and, as a necessary consequence, that a case is made out, within the authorities we have cited, for the exemption of the defendant.
Another point was raised by the pleadings, and referred, of course, to the referee; that is, that the transaction was tainted with usury, by reason of the transfer of the Little bond and mortgage, upon which $1075 only was received, it being, on its face, of the value of $1293.55.
The referee does not, in terms, pass upon the question of usury; but, as he finds the sum of $1075 due, with interest, he, of course, finds that there was no usury.
That question is one upon which serious doubts may be entertained. But it must be observed that it is by no means clear that 'the bond and mortgage were not, in fact, worth, in Townsend’s hands, the whole of the apparent amount due upon them. If the *282 case, then, was nakedly, that Carlisle, to meet his necessities, sold at a large discount, securities really worth their face, it would be difficult to make out a case of usury. At any rate, we are not prepared to place our judgment upon this point. As the conclusion upon the former point disposes of the case, we forbear considering this question further.
The judgment entered upon the report of the referee, must be reversed, and judgment dismissing the complaint be rendered, with costs.